IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | No. CR 24-MJ-00703 SCY |
| MARK ADAMS PRIETO ) | |
| ) | |
| Defendant. ) | |

**UNITED STATES' MEMORANDUM IN SUPPORT OF DETENTION**

Now comes the United States of America, by and through its undersigned attorneys, and requests the Court to detain Mr. Prieto pending trial as a flight risk and as a danger to the community.

**Detention Hearing Warranted**

Title 18, United States Code, 3142(f)(1)(E) requires a detention hearing pursuant to the government' motion, and the fact that the offense involves the "possession or use" of a firearm. Although the charged offense involves a transfer, and "use" is part of a reasonably anticipated crime by the recipient (as will be more fully explained below), "…when determining whether the Defendant's felony charge involves the possession of a firearm the Court may 'look beyond the elements of the charged offense to consider the actual conduct underlying the arrestee's charged offense,' *United States v. Watkins*, 940 F.3d 152, 167 (2d Cir. 2019), and consider "the actual conduct at issue in the specific case." *United States v. Syed*, 634 F. Supp. 1036, 1043 (D.N.M. 2022), citing *Watkins* at 166. Mr. Prieto possessed the firearm and transferred it to the recipient, whom he expected to use it in another crime. Therefore, the offense involves possession of the firearm and looking beyond the elements of the charged offense to the underlying conduct also

supports a finding of "possession or use." Therefore, a detention hearing is warranted pursuant to Title 18, United States Code, 3142(f)(1)(E).

## Legal Standard

When a court finds "that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community…" the defendant shall be detained pending trial. Title 18, United States Code, § 3142(e)(1). "The government bears the burden of proving risk of flight by a preponderance of the evidence and dangerousness to any other person or the community by clear and convincing evidence." *United States v. Mobley,* 720 F. App'x 441, 443–44 (10th Cir. 2017) (internal citations omitted), citing *United States v. Cisneros,* 328 F.3d 610, 615 (10th Cir. 2003).

## Charged Offense

Mr. Prieto stands charged by Complaint for one count of Trafficking in Firearms, in violation of Title 18, United States Code, §933(a)(1). This statute was passed in 2022. There is limited caselaw and legislative history analyzing the statute. The statute reads as follows:

(a) In general.--It shall be unlawful for any person to--

(1) ship, transport, transfer, cause to be transported, or otherwise dispose of any firearm to another person in or otherwise affecting interstate or foreign commerce, if such person knows or has reasonable cause to believe that the use, carrying, or possession of a firearm by the recipient would constitute a felony (as defined in section 932(a));

There are no known Ninth or Tenth Circuit jury instructions for this offense. A Department of Justice resource guide provides the following sample jury instruction:

The defendant is charged with trafficking a firearm (or firearms) in violation Title 18, United States Code, Section 933(a)(1) [or 933(a)(2) or 933(a)(3)]. For you to find the defendant

2

guilty of this crime, you must be satisfied that the government has proven each of the following things beyond a reasonable doubt:

**§ 933(a)(1):**

(1) That the defendant knowingly shipped, transported, transferred, caused to be transported or disposed of a firearm to another person.

(2) That the shipping, transporting, transferring, causing to be transported or disposition of the firearm was in or otherwise affecting interstate commerce.

(3) That the defendant knew or had reasonable cause to believe that the use, carrying or possession of the firearm by the other person/recipient would constitute a felony.

The underlying felony "use" for which the defendant had reasonable cause to believe the recipient would employ the firearm is the Georgia state Malice Murder statute, Ga. Code Ann. § 16-5-1. That statute reads:

(a) A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being.

(b) Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart.

The elements of Ga. Code Ann. § 16-5-1 are:

(1) the accused caused the death of another person;

(2) unlawfully; and

(3) with malice aforethought.

**Background and Evidence**

The majority of the relevant facts are contained in the Criminal Complaint Affidavit, Case No. MJ-24-04152-001-PCT-CDB, filed in the District of Arizona, provide to this court for proceedings thereon, and incorporated herein by reference.

After his arrest on May 14, 2024, at 9:08 p.m., Mr. Prieto was read his constitutional rights and agreed to be interviewed by agents. Over the course of approximately three hours, and another hour and a half while being transported to a detention facility, Mr. Prieto discussed his involvement in the charged crime. Mr. Prieto admitted to taking part in the planning the mass casualty event in Atlanta, Georgia, but claimed to interviewing agents that it was only a fantasy and that he would never have carried it out. Mr. Prieto admitted that he told the UC and CHS that he would travel to Atlanta in May to do reconnaissance of the venue where they planned to carry out the mass casualty event. Mr. Prieto told agents during the interview that he was on his way to visit his mother, not to do reconnaissance. Mr. Prieto admitted that he sold an AR-15 firearm to the UC specifically for the UC to use to commit the mass casualty event. He admitted to the interviewing agents that while pointing to the AR-15, he said to the UC, "use this one," while referring to the planned mass casualty event. He also claimed that he, the UC and CHS were planning to meet again at a gun show in Flagstaff, Arizona in June, and that he planned to call off the mass casualty event at that time.

Additionally, a search warrant was served on May 16, 2024, at the Prescott Valley residence where Mr. Prieto was living with an elderly man. Agents recovered approximately 178 firearms in the residence, including some suspected automatic firearms and short barreled rifles, so called National Firearms Act (NFA) firearms, that are illegal to possess without proper registration and a "tax stamp." Those firearms will be further analyzed by the Bureau of

Alcohol, Tobacco, Firearms, and Explosives Technology Branch to fully determine their status, but they have been tentatively identified as such. Some of the firearms, including some of the suspected NFA firearms were recovered in areas of the house specifically associated with Mr. Prieto. The elderly man who owns the home is known to own and possess firearms also.

<b><u>Title 18 USC § 3142(g) factors</u></b>

1. **Nature and circumstances of the charged offense:**

    933(a)(1) as charged in the complaint accuses Mr. Prieto of transferring a firearm in or otherwise affecting interstate commerce, having reasonable cause to believe that the use of the firearm by the recipient would constitute a felony. Mr. Prieto was planning a mass casualty event at a large public venue in Atlanta, Georgia, and was making those plans with the person to whom he transferred the firearm, and another person. Mr. Prieto was unaware that the persons he was making his plans with are a UC and a CHS.

    Mr. Prieto chose the city where the mass casualty event should take place and dictated the types of firearms that the trio would use. Mr. Prieto transferred the firearm in question, a mechanically specific type of AR-15 rifle, to the UC because the UC indicated that he did not have the type of firearm Mr. Prieto wanted everyone to use in the attack. Mr. Prieto transferred the firearm represented in the complaint specifically for the UC to use in the attack they were planning. While the transfer of a firearm may not be a crime of violence, the crime Mr. Prieto transferred the firearm to the UC to commit was murder. Specifically, to murder as many people as they could with the hope that it would start a race-based revolution in the United States.

    The nature and circumstances of Mr. Prieto's planned mass casualty event are heinous and depraved. Shootings like the one Mr. Prieto took part in planning victimize innocent people who are merely enjoying a public event or going about living their lives. Further, Mr. Prieto

specifically targeted people because of their race and hoped to bait them into starting a race-based revolution in the United States.

2. **Weight of the Evidence:**

Agents are in possession of the firearm Mr. Prieto sold to the UC. Discussions between the Mr. Prieto and the UC regarding the transaction are audio and video recorded. In a *Mirandized,* post-arrest, recorded interview, Mr. Prieto admitted to selling the firearm to the UC with the knowledge that the UC planned to use the firearm in the mass casualty event they were planning. Therefore, the weight of the evidence is substantial.

3. **History and Characteristics:**

   a. **Character**

Over the course of the investigation, Mr. Prieto claimed to have several experiences and abilities that could not be verified. He claimed to have travelled extensively outside the United States to such places as South America, Finland, Russia, and the Middle East, but agents could not find any record of him having a passport. He claims to have flown several types of aircraft in the United States and elsewhere, but agents could not find any record with the Federal Aviation Administration that he has a pilot's license. During his post-arrest interview, Mr. Prieto claimed the planned mass casualty event was just a fantasy and that he would never actually carry it out. His representations to the UC and CHS were not only that he wanted to do it, but that it must be done. Therefore, Mr. Prieto's character for truthfulness is questionable.

Throughout the investigation Mr. Prieto expressed bias and prejudice toward persons who look and believe differently than himself. He commonly referred to persons of other races by derogatory terms. Mr. Prieto told the UC and CHS that he wanted to place confederate flags at the scene of the planned mass casualty event and various other forms of propaganda referencing

6

the K.K.K. and offensive rhetoric to incite his victims to retaliatory violence and a race war. He wanted to make sure the mass casualty event was not confused to be some sort of gang related violence. In his mind, it had to unequivocally be perceived as race related. He expressed frustration with the direction the country is going and a willingness to do violence to change its direction. Mr. Prieto hoped that his planned violence would cascade far beyond the mass casualty event into country-wide violence. Therefore, Mr. Prieto may be fairly characterized as a person with biases and prejudices that lead him to want a race-based revolution that he believes will lead to the United States changing in ways desirable to him.

      b. **Mental condition**

Mr. Prieto's mental health history is unknown. He also refused to participate in a pretrial services interview that could have provided some insight into his personal history and characteristics. However, regarding the planned mass casualty event, Mr. Prieto said, "[y]ou want to corral them. And some people might be trying to leave out of a corner, and you want to blast those guys. Once [they] get the idea that they are trapped then there is pandemonium. Now they're in a panic. And they can't get out. Now they are going to be crawling over each other to get out." Mr. Prieto emphasized that the most important thing was a high body count and that, "[t]hese people don't belong here in this country anyway, okay." Mr. Prieto said he wanted to show "no mercy, no quarter" and advised the CHS and UC that that they "can't have any feeling, [because] they're not people. They're monsters as far as I'm concerned." Mr. Prieto's statements are expressions of someone with an "abandoned and malignant heart" toward other human beings.

While Mr. Prieto's statements are not necessarily indicative of someone with mental health issues, they are certainly indicative of someone whose mental condition is antisocial, bent

on violence, filled with hatred toward people who look or think differently than him, and a desirous of a race-based revolution.

### c. Family ties

Mr. Prieto has no known family ties to Arizona. Mr. Prieto's mother and stepfather live in Florida. Mr. Prieto was living in Prescott Valley, Arizona with an elderly man he says he has known for as many as twenty years. According to Mr. Prieto, he has lived with this man since approximately 2018 and acts as his caretaker.

### d. Employment

Mr. Prieto is not known to have any record of employment for many years. Records indicate that he has not filed taxes since 2011. Mr. Prieto appears to work as a caretaker for the elderly man he was living with, but no wages are reflected in Arizona Department of Economic Security records. Any compensation he receives appears to be under the table.

### e. Financial Resources

Mr. Prieto's financial resources are unknown. He appears to be living off of the resources of the elderly man he has been living with, and possibly through money earned through the sale of guns at gun shows. Mr. Prieto has no known bank accounts or other savings. He uses vehicles registered to the elderly man he lives with and is not the registered owner of any vehicles in Arizona. Mr. Prieto used the bank card of the elderly man he lived with to make household purchases, such as groceries. Other household bills were paid by checks drawn on the elderly man's account, sometimes signed by Mr. Prieto. During a search warrant served on the Prescott Vally residence on May 16, 2024, agents found thousands of dollars in cash in a safe to which Mr. Prieto had provided the entry code. Mr. Prieto represented to the CHS during the investigation that he had access to large amounts of cash.

    f. **Length of residence**

Mr. Prieto self-reports having lived in Prescott Valley, Arizona with the elderly man referenced above since approximately 2018. However, he is not known to own any property in Arizona and is not known to be on any lease or rental agreements. Nothing about his living situation suggests a financial or contractual tie to Arizona, and certainly not to New Mexico, within which he was merely traveling through headed east when he was arrested.

    g. **Community ties**

Mr. Prieto is not known to have any ties to New Mexico or to Prescott Valley, Arizona other than his service as a caretaker to the elderly man with whom he lives. Further, during the investigation Mr. Prieto refused to provide his phone number or tell the UC or CHS where he lives. Mr. Prieto is very secretive with his personal information.

    h. **Past conduct**

Mr. Prieto's past is unknown to investigators. As previously noted, he has not paid taxes since 2011. He essentially lives off the grid with little or no documentation, property, financial, or legal records in his name. Mr. Prieto refused to interview with Pretrial Services, and the PTSR similarly has no information as to his past conduct.

    i. **Drug abuse**

Mr. Prieto has no known drug or alcohol abuse issues.

    j. **Criminal History**

Mr. Prieto has no known criminal history.

    k. **Record of appearance for court proceedings**

Mr. Prieto is not known to have been required to appear in court in the past.

4. **Nature and seriousness of the danger to any person or the community**

Mr. Prieto was arrested while headed East across the United States in a vehicle owned by an elderly man he lives with. He told agents that he had five firearms and some ammunition in the vehicle. He claimed he planned to visit a gun show in Florida to sell or trade the firearms. Over the course of the past several months, Mr. Prieto was planning a mass casualty event in Atlanta, Georgia. He told the UC and CHS that he planned to do a reconnaissance trip in May to check out the venue where the attack was to take place. Mr. Prieto told agents that he was on his way to visit his mother in Florida. Mr. Prieto's statements to the UC and CHS are inconsistent with his post-arrest statements. Mr. Prieto's poor reputation for truthfulness draws everything he says into question. He simply cannot be trusted to tell the truth. It is possible that he was headed to the chosen venue in Atlanta, Georgia to conduct the mass casualty event on his own or to conduct reconnaissance and pre-stage the firearms he had with him, just as he had represented to the CHS and UC that he was planning to do.

In addition to having a questionable reputation for truthfulness, Mr. Prieto believes persons of other races do not belong in the United States and he wants to force them out through a race-based revolution. He expressed to the UC and CHS that he had hoped recent protests would have sparked off the revolution and that he would rather it happen that way but was steadfast in his belief that it had to happen, and they would do it if it did not happen some other way. It is a core belief of Mr. Prieto's that violence is the only way the United States can be changed to look and function like he believes it should. He expressed a fervent desire that his preferred changes come about through violence and a willingness to instigate his desired changes through violence he himself commits.

Mr. Prieto is a danger to anyone who does not look and think like he does. He wants horrible things to happen to such people to bring about change in the United States and has made plans with others to commit acts of violence to instigate his desired changes.

## Conclusion

Mr. Prieto lives secretively without the typical contractual, financial, and government registrations common among people in the United States. He essentially lives off the grid serving as a caretaker for an elderly man with whom he has no familial relationship, and is paid "under the table." Mr. Prieto has no significant ties to Arizona or New Mexico. If released, Mr. Prieto could abscond and continue living his off the grid lifestyle. He would be very difficult to locate. Therefore, Mr. Prieto is a flight risk and should be detained.

Mr. Prieto's plan to conduct a mass casualty shooting with hopes to kill as many people as possible make him an extremely dangerous person. His routine and practice is to purchase or trade for firearms in private sales that do not record firearm ownership. He is adept at acquiring firearms "off paper." Mr. Prieto wants a race-based revolution to take place in the United States and is willing to be the one to start it. He went so far as to make plans with two people he met at gun shows, the CHS and UC, to conduct a mass casualty shooting in a city he perceives to be the perfect place to start a race-based revolution. Mr. Prieto's mindset, prejudices, familiarity with the acquisition and use of firearms, and desire for violent upheaval in the United States make him a danger to people who look and think differently than him and the community at large. Therefore, Mr. Prieto should be detained as a danger.

Based on the foregoing, the United States respectfully requests that the Defendant be detained pending trial.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*Electronically Filed on May 17, 2024*

TAVO HALL
Assistant United States Attorney
201 Third St. NW, Suite 900
Albuquerque, NM 87102
(505) 346-7274

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to opposing counsel of record.

   *Filed Electronically*
TAVO HALL
Assistant United States Attorney