**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA

      Plaintiff,

v.                                  **No. CR 24-MJ-00703-SCY**

MARK ADAMS PRIETO

      Defendant.

**DEFENDANT'S RESPONSE TO UNITED STATES'
MEMORANDUM IN SUPPORT OF DETENTION [DOC. 9]**

Defendant, by and through his counsel of record, hereby submits the following Response to the United States' Memorandum in Support of Detention [Doc 9].

**Pretrial Release Standard**

The release or detention of a defendant pending trial is governed by the Bail Reform Act of 1984, 18 U.S.C. § 3142 (the "Act"). In *United States v. Salerno*, 481 U.S. 739 (1987), the Supreme Court upheld the constitutionality of the Bail Reform Act of 1984, while noting that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Id.* at 755. The Act expresses a preference for release upon conditions as the court may fashion, starting from release on personal recognizance and moving to various conditions, such as posting an appropriate bond, maintaining employment, restrictions on travel, regular reporting, and drug testing. 18 U.S.C. § 3142 (b), (c), and (e).

Under the Act, a defendant may be detained pending trial only if the Court finds "that no condition or combination of conclusions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.*; *United States v. Begay*, 315 Fed. Appx. 53, 54 (10th Cir. 2009). Additionally, courts must choose the least restrictive condition

or combination of conditions to reasonably assure the defendant's appearance and the safety of the community. *See* 18 U.S.C. § 3142(c)(1)(B).

In determining whether a defendant should be detained or released pending trial, the Court should consider the available information regarding:

(1) the nature and circumstances of the offense charged…;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including-- (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C § 3142(g).   In this case, a consideration of the Section 3142(g) factors supports Mr. Prieto's request for release pending trial in this matter.

## **18 U.S.C. § 3142(g) Factors**

1.   The nature and circumstances of the offense.

First, regarding the nature and circumstances of the charged offense under 18 U.S.C. § 3142(g)(1), the Government relies on several statements Mr. Prieto allegedly made to a UC and CHS whom he had met through his attendance at various gun shows in Arizona. In support of this factor, the Government apparently takes each of the statements that it claims were made by Mr. Prieto regarding a planned attack in Atlanta as the truth, and therefore as evidence of his intent to actually carry out such a plan. [Doc. 9 at 5] Later in its Memorandum, however, the Government claims just the opposite - that "Mr. Prieto's character for truthfulness is questionable" and points

out several statements that it claims were untrue or perhaps just a fantasy. [Doc. 9 at 6] Yet, if Mr. Prieto's character for untruthfulness is questionable, then the basis of the Government's argument in this section is questionable as well. If, however, Mr. Prieto's statements are to be taken as true indications of his intent, then his statements that the attack was just a fantasy and he never planned to actually carry it out should also be given equal weight.

    2.    <u>The weight of the evidence.</u>

According to the Government's Memorandum, the evidence on which it relies in this case consists of a firearm that Mr. Prieto sold to the UC and discussions in which Mr. Prieto allegedly admitted to selling the firearm to the UC with the knowledge that the UC planned to use the firearm in a mass casualty event. The Government claims that this evidence is "substantial." [Doc. 9 at 6] The Government argues that this sale of the firearm itself in connection with his purported knowledge that the UC would use the firearm in connection with a felony[1] constitutes a violation of 18 U.S.C. 933(a)(1).

Earlier in its Memorandum, the Government describes the charged offense and states that there is no Ninth or Tenth Circuit jury instruction for this offense. [Doc. 9 at 2] Accordingly, it then goes on to provide a sample instruction from a Department of Justice resource guide, which is as follows:

**§ 933(a)(1):**

(1) That the defendant knowingly shipped, transported, transferred, caused to be transported or disposed of a firearm to another person.
(2) That the shipping, transporting, transferring, causing to be transported or disposition of the firearm was in or otherwise affecting interstate commerce.
(3) That the defendant knew or had reasonable cause to believe that the use, carrying or possession of the firearm by the other person/recipient would constitute a felony.

---

[1] In the Criminal Complaint, SA Harp does not allege that Mr. Prieto knew the UC planned to use the firearm in the mass casualty event, but rather that he told the UC that the firearm would be a good gun to use in the attack. [Doc. 2, ¶36]

*Id.* at 3. Notably, the third element of this instruction differs slightly, but significantly, from the language of the statute. As outlined in the Government's Memorandum, 18 U.S.C. 933(a)(1) states that:

> (a) In general.--It shall be unlawful for any person to--
> (1) ship, transport, transfer, cause to be transported, or otherwise dispose of any firearm to another person in or otherwise affecting interstate or foreign commerce, if such person knows or has reasonable cause to believe that the use, carrying, or possession of **a** firearm by the recipient would constitute a felony (as defined in section 932(a)).

18 U.S.C. 933(a)(1) (emphasis added). The Government's stated jury instruction replaces the definite article "the" for the indefinite article "a" that is used in the statute. This replacement may seem innocuous, but it has an important impact on what the Government would have to prove in order to convict a defendant, such as Mr. Prieto, of this crime. "Use of the definite article 'the' refers to a specific noun (namely, the specific controlled substance). Use of the indefinite article 'a,' however, refers to non-specific nouns." *Johnson v. Barr*, 967 F.3d 1103, 1110 (10th Cir. 2020).

Here, by changing the article from an indefinite "a" to the definite "the", the government has attempted to alter the conduct this statute prohibits. If an individual is prohibited from transferring a firearm in interstate commerce having reasonable cause to believe that the transferee's use of that specific firearm would constitute a felony, as the Government's sample instruction indicates, then its factual allegations (if true) may arguably support the offense it has alleged in the Complaint.[2] If however, the Court looks to the language of the actual statute, which contains the indefinite article "a" in reference to the transferred firearm, the evidence necessary to support a conviction changes significantly. Pursuant to the unambiguous language of this statute,

---

[2] Mr. Prieto does not concede this point, but makes this statement only in support to his argument that the Government's alteration of the elements of this offense is the only possible way that its proffered evidence might support its argument.

the Government is required to prove that a defendant transferred a firearm in interstate commerce knowing or having reasonable cause to believe that the transferee's possession or use of *any* firearm would constitute a felony. In this case, there is no evidence in the Complaint or elsewhere that indicates Mr. Prieto had reason to believe that the UC was prohibited from using, possessing, or carrying **a** firearm. The language of this statute is clearly written and must be interpreted as such. "If the terms of the statute are clear and unambiguous, the inquiry ends and we simply give effect to the plain language of the statute." *United States v. Sprenger*, 625 F.3d 1305, 1307 (10th Cir. 2010).

Counsel agrees with the Government's statement that there is limited caselaw and legislative history analyzing this statute. There is, however, a recent case out of the Middle District of Tennessee that confirms the defense's interpretation. In *United States v. Strukov*, the District court held:

> A violation of § 933(a)(1) requires proof that (1) the defendant *transferred* a firearm by any number of different means—shipping, transporting, causing to be transported, transferring or "otherwise dispos[ing]"—(2) to a third person (3) known by the transferor to be a prohibited person under § 932(a). Subsection (a)(2) requires proof that (1) the defendant *received* a firearm (2) while knowing that *he* is a prohibited person. For (a)(1), the defendant's transfer of a firearm and his knowledge of the recipient's status are the key elements of the crime, while the actual status of the recipient and his *mens rea* are irrelevant.

*United States v. Strukov*, 2024 U.S. Dist. LEXIS 62166, *21-22 (M.D. Tenn Apr. 4, 2024) emphasis in original). Here, there is simply no evidence that Mr. Prieto had knowledge that the UC was a prohibited person (and, of course, any FBI agent is certainly not). Without any evidence of this essential element of the offense alleged, the Government's argument regarding the weight of the evidence not only fails, but the Government lacks the requisite probable cause to believe the charged offense was committed.

3.    <u>History and characteristics.</u>

First, Mr. Prieto's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings weigh in favor of his pretrial release. Again, while the Government attacks Mr. Prieto's character based on its allegations that he made claims to the UC and CHS that could not be verified, and that he therefore lacked truthfulness, at the same time, the Government relies heavily on the statements it claims he made to the very same UC and CHS in support of its arguments concerning: 1) the nature of the offense; 2) the weight of the evidence; and 3) his character. [Doc. 9 at 5-6] The Government argues both that Mr. Prieto's statements should be given weight when it is to its own benefit and calls into question his truthfulness when it does not agree with what he says.

With respect to the Government's reliance on what it refers to as Mr. Prieto's expressed bias and prejudice toward persons who look and believe differently than himself, even if true, and while they are certainly not views that most of us share or endorse, Mr. Prieto's personal beliefs and opinion should not be a basis for pretrial detention, particularly when the Government itself states that Mr. Prieto informed agents that he would have never followed through with any alleged attack. Mr. Prieto also has no prior physical or mental health diagnoses that would weigh in favor of detention.

Next, there is nothing regarding Mr. Prieto's employment, financial resources, length of residence in the community, and/or community ties (or alleged lack thereof) that justify his pretrial detention. Rather, Mr. Prieto's employment and living situation provide evidence that he is neither a flight risk nor a danger to the community. Mr. Prieto moved from Florida to Arizona in 2018 to

help care for his close friend of more than 20 years, Gilbert, and he has resided there ever since. Gilbert is 84 years old and requires assistance for his day-to-day care. While previously in a nursing home, he suffered an injury to his leg and also suffers from other health issues. As a result, Mr. Gilbert is unable to drive, has mobility issues, and relies on the aid of Mr. Prieto for cooking, paying bills, looking after his dog, and other general household tasks. According to Gilbert, Mr. Prieto saved his life by enabling him to leave the nursing home and he could not get by without him. Thus, although Mr. Prieto may not have traditional employment, he resides with Gilbert and serves as his full-time caretaker. In order to travel to visit his mother in Florida this past week, Mr. Prieto arranged for Gilbert's temporary care at the VA. Gilbert informed undersigned counsel that Mr. Prieto has taken the trip to Florida to see his mother several time since he moved in with him about six years ago and that Mr. Prieto left last week to visit his mother in Florida as he had done in the past.

Gilbert described Mr. Prieto as a good man who has taken better care of him than anyone else. He stated that he has known Mr. Prieto for more than 20 years, and that if Mr. Prieto could not come back to take care of him, it would be the equivalent of a death sentence for him. Mr. Prieto's deep care and concern for his friend Gilbert and his commitment to providing his care demonstrate that, if released, Mr. Prieto would neither be a flight risk nor present a danger to the community. He would return to Arizona to take care of his close friend and be sure to attend all required hearings in the District of Arizona because he would not want to jeopardize his release status and become unable to assist his friend Gilbert. Although not blood relatives, the two are essentially family. Mr. Prieto's life in Arizona and his important responsibilities to Gilbert are community ties that will ensure that he will not flee or endanger anyone. Moreover, the imposition

of conditions such as location monitoring and home visits could alleviate any concerns that the Court might still have.

Next, the fact that Mr. Prieto may not have known bank accounts or savings also fails to provide support for his detention. Many people in the United States choose not to keep their money in banks for various reasons. Also, Mr. Prieto uses Gilbert's vehicles to get groceries and medicine and to run household errands, and Gilbert stated that Mr. Prieto has a power of attorney so that he can use his bank card and checks to purchase the food, gas, and other supplies necessary to take care of Gilbert and his home as well as to help him to pay his bills. The fact that Mr. Prieto willingly provided agents with the code to the safe in the home also shows that he was not trying to hide its contents or his financial resources from agents.

Again, Mr. Prieto has lived in the Prescott Valley area for approximately six years, which is not an insignificant amount of time. Moreover, because he relocated there from Florida in order to be a live-in caretaker for his friend Gilbert, he has no need to own property or to lease a residence. While the Government argues that Mr. Prieto has no financial or contractual ties to Arizona, the importance of his caretaking responsibilities and his friendship outweigh any apartment lease. His community is comprised of his friends and his household. It is also of no significance that he did not wish to provide a couple of guys he met at some gun shows with his address (particularly since he resides with his elderly friend) or his phone number. And, if he really intended to plan an attack with these men, one would think that they would have at least exchanged numbers.

Mr. Prieto's past conduct is unknown to investigators for the simple reason that he has no criminal history and has not been involved in anything that would come up in an investigation. Given its usual position that a defendant's prior conduct constitutes evidence that he or she should

be detained, it is curious that the Government would now attempt to use Mr. Prieto's lack of criminal history or involvement in other legal or administrative proceedings, etc. as evidence against his release. Moreover, Mr. Prieto does not live "off-grid" – the Government knows precisely where he resides, as shown by the statements in its Memorandum. He also did not "refuse" to interview with Pretrial Services. Rather, he was waiting to consult with his court-appointed attorney prior to participating in an interview.

Finally, the Pretrial Services Report filed in this matter establishes that, at the time of the current offense or arrest, Mr. Prieto was not on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law. Mr. Prieto also has absolutely no record of failing to appear at any court appearance. [Doc. 8 at 2]

4. <u>Nature and seriousness of danger to any person or the community</u>.

The Government argues that Mr. Prieto poses a danger based on facts including that he was driving Gibert's vehicle to Florida, voluntarily informed agents that there were firearms in the vehicle, and was headed to Florida. He was driving the vehicle with permission and, as explained, uses his friend's vehicles regularly to help with transportation and household errands. The Government is also aware that Mr. Prieto frequented gun shows and that his mother lives in Florida. As mentioned herein, he also informed Gilbert before he left that he was traveling to Florida. Nonetheless, the Government states that "[i]t is possible that he was headed to the chosen venue in Atlanta, Georgia." [Doc. 9 at 10] The Government's speculation does not meet the standard of clear and convincing evidence required to detain Mr. Prieto based on dangerousness.

In support of its dangerousness argument, the Government once again focuses on its allegation that Mr. Prieto is not truthful. But again, the basis of nearly all of the Government's

allegations, both in its Complaint and its Memorandum, consist of statements that were allegedly made by Mr. Prieto to the UC and CHS. The Government is simultaneously and confusingly stating that Mr. Prieto's statements should be believed and that they cannot be believed. It is picking and choosing which statements to deem credible to suit its theory of the case. The Government's own statements state that Mr. Prieto: provided agents the code to the safe in his residence, informed them about the firearms in the vehicle and that there were more firearms at his residence, was traveling to Florida (which was confirmed by his friend Gilbert), and allegedly admitted to them that he knew the CHS and UC and having discussed an attack in Atlanta. The Government also states that he informed agents that he did not actually intend to go forward with an attack. [Doc. 2 at ¶36] With the exception of the last statement regarding his lack of intent, the Government seems to believe that Mr. Prieto was, indeed, truthful in his statements to agents. The Government's claim that this sole final statement is untruthful is unconvincing. Overall, the Government has not set forth clear and convincing evidence that Mr. Prieto will present a danger if released.

## Conclusion

The arguments and alleged facts set forth in the Government's Memorandum fail to provide evidence sufficient to meet the Government's burden of providing that Mr. Prieto is either a flight risk or a danger to the community, and in fact he is neither. Mr. Prieto therefore requests that the Court deny the United States' request for detention and order his release.

Respectfully Submitted:

*/s/ Alicia M. LaPado*
Alicia M. LaPado
6801 Jefferson St. NE, Suite 210
Albuquerque, NM 87109
(505) 848-8581
Alicia@BusinessLawSW.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 20th day of May 2024, I filed the foregoing electronically through the CM/ECF system, which caused all counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:


*/s/ Alicia M. LaPado*
Alicia M. LaPado